UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | |
| v. : | Criminal No. 20-cr-252 |
| : | |
| STEPHEN PAUL EDMUND SUTTON : | |
| : | |
| Defendant. : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully provides the following memorandum in aid of sentencing. For the reasons set forth below, the government recommends this Court (1) impose a sentence of time-served; (2) impose a three-year term of supervised release; and (3) order the defendant to pay restitution in the amount of at least $21,792.84; (4) enter a forfeiture money judgment in the amount of $21,792.84; and (5) enter a Judicial Removal Order requiring that the defendant be removed from the United States to England, or a country as deemed appropriate by the Department of Homeland Security, United States Immigration and Customs Enforcement ("ICE") under the controlling legal authorities.

**I.     Procedural Background**

On November 17, 2020, the United States of America filed a two-count Indictment against defendant, Stephen Paul Edmund Sutton ("the defendant"), charging the defendant with: (1) Conspiracy to Commit Theft Concerning a Program Receiving Federal Funds and to Defraud the United States; and (2) Theft Concerning a Program Receiving Federal Funds. On May 19, 2025, the defendant is expected to plead guilty to Count 1, and specifically to Conspiracy to Commit Theft Concerning a Program Receiving Federal Funds. As part of a plea agreement, the United

States agreed to cap its allocation to time-served and three years of supervised release. The parties also agreed to waive a presentence investigation should the Court find that the information in the record will enable it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553. *See* F. R. Crim. P. 32(c)(1) (requiring the probation officer to conduct a presentence investigation and submit a report to the Court "unless the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record"). The government encourages the Court to do so under the circumstances of this case.

As elaborated below, the defendant received $21,792.84 in kickback payments as part of the conspiracy to which he is expected to plead guilty. Accordingly, the parties have submitted a Consent Order of Forfeiture in that amount and have further agreed to restitution in at least that amount.[1]

The defendant is not a citizen of the United States and has no ties here. Following about 26 months of extradition proceedings in the United Kingdom, the defendant was paroled into the United States for the purpose of prosecution at Dulles International Airport on or about May 1, 2025. As part of the plea agreement, the defendant agreed to the entry of a Judicial Removal Order. The United States requests that the Court, at the time of sentencing, order that the defendant be removed from the United States to England, or a country as deemed appropriate by ICE under the controlling legal authorities. Although the defendant has agreed that a removal order will be issued against him to England, he will voluntarily facilitate his departure from the United States to England with ICE's supervision. In anticipation of the Court's granting of the removal order and

---

[1] As explained below, based on the United States' estimate of loss in this case, Prime Contractor (and thus USAID) was deprived of *at least* $97,032 after accounting for services rendered by the local vendors who were hired to perform the work at a fraction of the cost.

waiver of the presentence investigation, the defendant has purchased a ticket to depart the United States back to England on the same day that he is sentenced. This process will effectuate defendant's removal while saving the government resources.

## II.     Factual Background

Between approximately May 2015 and approximately November 2015, the defendant and his codefendant, Atif Gillani ("Gillani"), agreed to participate in a conspiracy involving Prime Contractor, a USAID contractor of which they were employees and agents. As part of this conspiracy, the defendant and Gillani obtained funds in Prime Contractor's care, custody, and control by fraud. Prime Contractor was an international professional services firm headquartered in Washington, D.C. From 2010 to 2015, Prime Contractor implemented a USAID-funded power distribution program (PDP) in Pakistan obligated at more than $200 million. For its contract in connection with the PDP, Prime Contractor was an organization that received more than $10,000 in federal benefits, as that term is defined by 18 U.S.C. § 666(b) during calendar year 2015.

PDP was a component of U.S. government assistance to the government of Pakistan to support its energy sector. Launched in September 2010, the five-year program was designed to facilitate improvements in Pakistan's government-owned electric power distribution companies through interventions and projects addressing governance issues, technical and non-technical losses, and low revenue collection. The main goal of the PDP was to improve the commercial performance of the participating distribution companies through technology upgrades and improvements in processes, procedures, and practices, as well as training and capacity building. Under the PDP contract, Prime Contractor subcontracted through purchase orders with vendors in Pakistan for certain goods and services.

In 2015, the defendant, a United Kingdom citizen, was a Logistics Operations Manager for Prime Contractor. From at least May 2015 through at least November 2015, the defendant and Gillani participated in a kickback scheme involving Prime Contractor by creating two companies, Al-Shams Mohmand Goods Container Services (also known as Al-Shams Logistics and Al-Shams Terminal) ("Al-Shams" or "AS")[2] and S.A. Logistics International (also known as S.A. Logistics) ("S.A. Logistics" or "SA"), obtaining PDP purchase orders for forklift and crane services for the companies, and distributing the profits to themselves. As part of the scheme, the defendant and Gillani made materially false representations and concealed material facts from Prime Contractor about their relationships with these companies and the kickback scheme. For example, in August 2015, when an accounts payable officer denied payment on an invoice because Al-Shams' business name was not on the bank account to which payment was requested, and because Al-Shams did not have a business National Tax Number (NTN), Sutton instructed the accounts payable officer to pay the invoice, stating that Al-Shams was a small business based in Peshawar and that it was "very common for Peshawar based businesses not to hold a business bank account or NTN." The payment to Al-Shams was approved.

Over the course of the conspiracy, Sutton received at least a portion of the kickbacks he received through his wife's bank account. A review of bank records demonstrates that Gillani made eight separate kickback payments totaling $21,792.84 to Sutton's wife's bank account between June 16, 2015, and November 16, 2015. Sutton's wife did not work for or with Prime Contractor. All the payments made into Sutton's wife's account arose from Prime Contractor's overpayment for services rendered pursuant to inflated invoices submitted in the name of both sham companies identified above.

---

[2] There was a legitimate company in Pakistan under the name Al-Shams Mohmand Goods Container Services that was not connected to the kickback scheme.

4

Between June 2015 and November 2015, Prime Contractor paid a total of $194,064 to Al-Shams and S.A. Logistics, as follows:

| Date | Purchase Order # | Sub-contractor | Amount PKR | Approximate Amount USD |
|---|---|---|---|---|
| 6/4/15 | 340B | AS | 837,247 | $8,216 |
| 6/4/15 | 340A | SA | 577,304 | $5,665 |
| 7/7/15 | 340B | AS | 2,232,660 | $21,948 |
| 7/7/15 | 340A | SA | 1,539,478 | $15,119 |
| 8/10/15 | 340B | AS | 2,139,632 | $21,001 |
| 8/10/15 | 340A | SA | 1,411,188 | $13,860 |
| 8/20/15 | 381 | AS | 769,300 | $7,546 |
| 9/9/15 | 381 | AS | 675,700 | $6,489 |
| 9/14/15 | 340B | AS | 2,976,879 | $28,514 |
| 9/14/15 | 340A | SA | 2,116,782 | $20,256 |
| 10/27/15 | 340B | AS | 1,960,000 | $18,617 |
| 10/30/15 | 340A | SA | 1,967,111 | $18,636 |
| 11/11/15 | 381 | AS | 306,000 | $2,899 |
| 11/24/15 | 340B | AS | 558,165 | $5,298 |
| Total | | | 20,067,446 | $194,064 |

A Senior Procurement Specialist employed by Prime Contractor stated to investigators that he objected to the rates for AS and SA as being "two or three times more than the normal cost but his objection was rejected by Sutton." Thus, as a result of the conspiracy to which the defendant has admitted, Prime Contractor (and thus USAID) was deprived of at least $97,032 (i.e., twice the "normal cost").

### III.    Applicable Guidelines Range

As reflected in the plea agreement, the parties dispute the applicable Guidelines range. The United States's position that the appropriate guideline for the substantive offense comprising the object of the conspiracy is U.S.S.G. § 2B1.1 is based on the instructions for determining the applicable Guidelines in U.S.S.G. § 1B1.2(a) and the Statutory Index specifying the U.S.S.G. sections applicable to the statute of conviction. Based on the United States' position, the following Sentencing Guidelines sections apply:

| | | |
|---|---|---|
| U.S.S.G. §§ 2X1.1(a)(2) and 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(e) | Loss > $95,000 | +8 |
| U.S.S.G. §§ 2B1.1(b)(10)(B) | Outside U.S. | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| U.S.S.G. § 4C1.1 | Zero-Point Offender | -2 |
| | **Total** | **11** |

As noted above, the United States agreed that a 2-level reduction in the defendant's estimated offense level was warranted, and now agrees that an additional 1-level reduction is appropriate pursuant to U.S.S.G. § 3E1.1. As it appears the defendant has no criminal history points and otherwise satisfies all the criteria in U.S.S.G. § 4C1.1, he also appears eligible for a 2-level reduction as a zero-point offender.

Based on the United States' calculations, assuming the Court agrees the defendant has demonstrated acceptance of responsibility and zero-point offender eligibility, the defendant's total offense level is 11, with a Guidelines range of 8-14 months. Such a sentence falls within Zone B of the Guidelines, meaning a sentence of probation with a condition of community confinement or home detention, a split sentence, and a sentence of imprisonment is typically appropriate.

**IV.    Section 3553 Factors Weigh In Favor of a Time-Served Sentence.**

"A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence . . . [T]he correct [approach] . . . is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a)." *United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007); *see also United States v. Terrell*, 696 F.3d 1257, 1261-62 (D.C. Cir. 2012); *cf. Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that a within-Guidelines sentence may be presumed reasonable on appeal). Pursuant to 18 U.S.C. § 3553(a), in determining the particular sentence to be imposed, the Court is to consider, *inter alia*:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
> . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. ' 3553(a). "The district court is not required to refer specifically 'to *each* factor listed in § 3553(a),' nor is it required 'to explain sua sponte why it did not find [a particular] factor relevant to its discretionary decision' if 'a defendant has not asserted the import of [that] factor.'" *United States v. Bras*, 483 F.3d 103, 113 (D.C. Cir. 2007) (quoting *United States v. Simpson*, 430 F.3d 1177, 1186-87 (D.C. Cir. 2005)). The Court must impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).

The defendant's conduct in this case is serious, having contributed to a $97,000 loss to Prime Contractor, who was funded with USAID grant monies. It is conduct that well warrants a felony conviction and consequences for any defendant, including the period of incarceration already served here. And this defendant has suffered consequences: extradition to, and detention in, a country foreign to him for about one month, which followed a 26-month period of extradition litigation in his home country, a period (akin to pretrial release) that subjected him to supervision prior to his first appearance in this Court.

But here, notwithstanding the seriousness of the defendant's offenses, there are several mitigating factors in this case. The defendant is 53 years old and has no prior criminal convictions in the United States or the United Kingdom. Once extradited, he agreed to plea quickly. By waiving his rights to a jury trial, he has saved government and court resources. He has also agreed

to pay restitution in the amount constituting his actual gain from the offense, and to the entry of an order of forfeiture, to help ameliorate the financial effects of his fraud.

He no longer works for Prime Contractor, the federal agency that indirectly funded the subcontracts is in the process of being dismantled, and he lives in England and has no other known ties to the United States. Accordingly, there is no need for specific deterrence here.

According to the Interactive Data Analyzer on the U.S. Sentencing Commission's website, of the 2,148 cases reported to the Commission in the past five years involving similarly situated defendants (Zone B, Criminal History I), 52% received sentences of probation.[3] Nine of these defendants were sentenced in the District of Columbia. Of those nine, seven received probationary sentences.[4] Any sentence of alternative confinement in this case would be impracticable, as the defendant will be unable to comply. He has no legal basis to remain in this country absent these proceedings and there is already an immigration detainer in place pursuant to which he will be transferred to the custody of ICE and deported. Notably, in this case, during the two-year-plus period that the defendant engaged in litigation to prevent his extradition, he experienced conditions that required him to stay in England and Wales, to sleep at his residence every single night, and to check in with police three times per week. These conditions are similar to the conditions often imposed on defendants who must work while also complying with alternative conditions of confinement.

In other words, given the relatively low loss amount at issue, the 26-month period of

---

[3] 831 (38.7%) received a probation-only sentence, and 424 (19.7%) received probation and "alternatives" (i.e., conditions of confinement such as intermittent confinement, community confinement, or home detention).

[4] Two (22.2%) received sentence of probation, and five (55.6%) received sentences of probation and alternatives.

supervision and restricted travel and curfew conditions placed on the defendant prior to arrival in the U.S., the approximate one-month period of incarceration he has already incurred, and the financial penalties– under the unique circumstances of this case – a sentence of time served is warranted.

In sum, the requested sentence, along with orders of forfeiture, restitution, and judicial removal, is reasonable under the Sentencing Guidelines and the statutory factors as applied to the facts of this case. Such a sentence reflects the seriousness of the offense while also taking into consideration other factors that militate in the defendant's favor.

## V.   CONCLUSION

For the reasons set forth above, the United States requests this Court to (1) impose a sentence of time-served; (2) impose a three-year term of supervised release; and (3) order the defendant to pay restitution in the amount of at least $21,792.84; (4) enter a forfeiture money judgment in the amount of $21,792.84; and (5) enter a Judicial Removal Order requiring that the defendant be removed from the United States to England, or a country as deemed appropriate by ICE under the controlling legal authorities.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:   /s/ *Emily A. Miller*
Emily A. Miller
Assistant United States Attorney
D.C. Bar No. 462077
601 D Street, N.W. | Washington, D.C. 20530
(202) 252-6988 | Emily.Miller2@usdoj.gov

9